**In re OLMSTED UTILITY, INC., Debtor.**

**DIRENFELD, GREENE & BLACKBURN CO., Movant,**

v.

**OLMSTED UTILITY, INC., Respondent.**

**Bankruptcy No. B88–02089.**

United States Bankruptcy Court, N.D. Ohio.

May 31, 1991.

Douglas C. Blackburn, Direnfeld, Greene & Blackburn Co., Cleveland, Ohio, for Direnfeld, Greene & Blackburn Co.

Stephen V. Cheatham, Arter & Hadden, Cleveland, Ohio, for debtor.

## MEMORANDUM OF OPINION

DAVID F. SNOW, Bankruptcy Judge.

Direnfeld, Greene & Blackburn Co., L.P.A. ("DGB"), former counsel to the Debtor, filed a motion in this case to value its retaining lien in certain pleadings and other papers which the Court ordered it to make available to the Debtor at the commencement of this case. Although the parties agree that Direnfeld provided legal services to the Debtor having an aggregate value in the amount claimed, they disagree as to the value of DGB's lien. DGB contends that under Ohio law its attorney's retaining lien should be valued at the full amount of its unpaid services. The Debtor contends that DGB's lien is worth at most the value of DGB's services related to the specific papers copied by the Debtor. For the reasons discussed below the Court accepts neither party's contention and will set this matter for further hearing in accordance with this opinion.

### Background

The Debtor filed its petition for reorganization on June 7, 1988. One of its first actions was to request this Court to order DGB to turn over to the Debtor its file in a case styled *David Anderson v. Olmsted Utility Equipment, Inc.,* in the Court of Common Pleas of Trumbull County, Ohio, case number 86 CV 608 (the "Anderson Case"). DGB replied asserting its attorneys retaining lien for the full amount of its unpaid legal fees in both the Anderson Case and in another unrelated case styled *Steven Smoot v. Dorsey Trailers,* in the Court of Common Pleas of Lucas County, Ohio, case number 87–1324 (the "Smoot Case"). According to the Debtor's motion the Debtor had only a few weeks to perfect its appeal and needed access to the papers in the Anderson Case in DGB's possession to familiarize itself with the case.

After a hearing on the turnover motion, the Court in August 1988 ordered DGB to make available to the Debtor the file in the Anderson Case for examination and copying; that order went on to provide that notwithstanding the turnover DGB's retaining lien was to be preserved and would be valued at a subsequent hearing. The order did not provide DGB a replacement lien or other security by way of adequate protection. The valuation hearing has been postponed for several years in part to permit the Debtor time to attempt to deal with DGB's lien in its reorganization plan and in

part to await the result of the Debtor's appeal in the Anderson case.

It appears that the Debtor has had some success with the appeal; the appeals court reversed the trial court's dismissal of third party defendants whom the Debtor alleged were responsible in whole or in part for the damages reflected in the award against the Debtor. The case has been remanded for further proceedings to the trial court. At this point, however, it is not clear what impact, if any, the appeal will have on the Debtor, its estate or its creditors.

Debtor's fortunes did not improve in the course of its attempted reorganization. Debtor continued to lose money and on April 10, 1991 the Court confirmed a liquidating plan pursuant to which the Debtor has sold or will sell its remaining assets. The Debtor and DGB failed to agree on a valuation of DGB's lien in the plan; instead they left open the possibility of the Court determining that the DGB claim might be given priority or secured status in whole or in part. In the latter event, any balance would be deemed unsecured. It appears unlikely that there will be any dividend on unsecured claims.

The parties have filed several briefs as well as a pretrial statement which reveal that the parties' dispute as to the valuation of DGB's lien stems from a differing analysis of applicable legal principles—not from disputed facts. DGB has filed a proof of claim for its fees—$20,799 relating to the Anderson Case and the other $1,500 relating to the Smoot Case—for a total of $22,299. Although the Debtor had originally suggested that DGB's lien might be invalidated in whole or in part as a preference, it has apparently abandoned this argument. Debtor had also argued that DGB's retaining lien did not include DGB's fees in the Smoot Case but has cited no authority in support of its position which appears inconsistent with Ohio law. *See* 6 O.Jur.3d *Attorneys at Law* § 177 (1978). It appears, therefore, that DGB has a valid attorney's retaining lien for the full $22,299 owed to it.

In the Joint Pretrial Statement the Debtor lists the papers which it copied after examination of DGB's file in the Anderson Case. It contends that each of these papers was a matter of public record which it could have copied at a maximum of 50 cents a page, proving to its satisfaction that DGB's retaining lien afforded it no real leverage and should be accorded no substantial value. DGB does not take issue with the Debtor's list of papers copied but argues that it is irrelevant. It claims that whatever the Debtor copied, this Court's order provided the Debtor access to all of the papers in the Anderson Case in DGB's possession. It argues further that Debtor obtained access to these papers by allegations of pressing need in its turnover motion and, having been given its way, cannot now claim that what it obtained was valueless. DGB also makes the point that the Debtor has since the turnover achieved some success in the appeal of the Anderson Case.

There is some merit to each party's argument. The Court is particularly sympathetic to the dilemma in which DGB finds itself; having been forced to make its papers available to the Debtor without payment or security—the precise thing which the attorneys lien is intended to preclude—it is now told that its lien is valueless and that the Debtor could have gotten along very well without it. But DGB's predicament reflects the anomalous nature of the attorney's retaining lien in the bankruptcy process and the inherent conflict between the retaining lien and bankruptcy principles. Although that conflict is muted in the cases, it is nevertheless real.

### Discussion

Most courts that have attempted to reconcile the retaining lien with the bankruptcy process have done so in the context of the attorney's refusal to comply with the debtor's turnover request under section 542(e) of the Bankruptcy Code. Section 542(e) provides that:

> Subject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and

papers, relating to the debtor's property or financial affairs, to [to] [sic] turn over or disclose such recorded information to the trustee.

Note that the subsection does not indicate what happens to the retaining lien or whether the professional is entitled to any sort of adequate protection as a condition to the turnover. Although the accompanying House Report pretty clearly suggests that section 542(e) is intended to reduce the professional's leverage, it does not suggest a clear answer to these questions. It provides:

Subsection (e) requires an attorney, accountant, or other professional that holds recorded information relating to the debtor's property or financial affairs, to surrender it to the trustee. This duty is subject to any applicable claim of privilege, such as attorney-client privilege. It is a new provision that deprives accountants and attorneys of the leverage that they have today, under State law lien provisions, to receive payment in full ahead of other creditors when the information they hold is necessary to the administration of the estate. (House Report No. 95–595 to accompany H.R. 8200, 95th Cong., 1st Sess. (1977) p. 369, U.S. Code Cong. & Admin.News 1978, pp. 5787, 6325.)

There is no consensus in the decided cases as to how these questions are to be answered, although the courts do seem to be unanimous in concluding that section 542(e) does not void the retaining lien and that the lien is entitled to appropriate valuation and payment at some point in the case.

The results in the cases have varied widely. One of the first courts to grapple with the problem permitted the debtor to examine papers held by the attorney and ordered the debtor to make adequate protection payments equal to the fees allocable to any of the documents it chose to copy or remove. *In re Life Imaging Corp.*, 31 B.R. 101 (Bankr.D.Colo.1983). Although this approach has the virtue of simplicity and ease of application, it has not been followed. It is, however, the approach the Debtor suggests in this case if the Court is to provide DGB any recovery on its lien.

One of the problems with this approach, highlighted in DGB's brief, is that in affording the Debtor the right of examination in order to determine which papers to copy or remove, the Court has already permitted a substantial erosion of the retaining lien. In *Foor v. Huntington National Bank*, 27 Ohio App.3d 76, 499 N.E.2d 1297 (1986), the Ohio court held that the client could not inspect the papers in the attorney's possession without securing the fees claimed. *See also, The Flush*, 277 F. 25, 29–31 (2nd Cir.1921), *cert. denied*, 257 U.S. 657, 42 S.Ct. 184, 66 L.Ed. 421 (1922). Moreover, there is little correlation between the costs attributable to any particular document in the professional's possession and the practical leverage of withholding that document from the client. The court's approach does, however, reflect an attempt to transform the retaining lien into something which fits the categories of the Bankruptcy Code.

In *In re Jarax International, Inc.*, 81 B.R. 715 (Bankr.S.D.Fla.1987), the court ordered a law firm to permit the trustee to inspect and copy the applicable records and reserved ruling on the amount, validity and priority of its retaining lien "until the law firm has filed a proper proof of claim and the estate has assets adequate to satisfy a claim of lien at the time for allowance of claims in the ordinary course of administration." The court went on to say "if the records have been essential to recovery of assets, this court will value the lien commensurate with the amount of the recovery." 81 B.R. at 718. The court made short shrift of the attorney's attempt to deny the debtor access to the papers in its possession, finding this repugnant to administration of the bankruptcy case:

Granting an accountant or attorney a retaining lien in undisclosed information in a bankruptcy context would force the trustee to buy a "pig in a poke," and coerce this estate into granting lien privileges for information or records which may be worthless. Neither an attorney nor an accountant should be permitted to hold a bankruptcy estate hostage with undisclosed information. Neither an at-

torney nor an accountant should be permitted to force the trustee in bankruptcy to gamble with the assets of the bankruptcy estate that the information or records held by the attorney or accountant are of real value to the estate.

81 B.R. at 718.

A similar result was reached in *Federal Land Bank v. Federal Intermediate Credit Bank,* 128 F.R.D. 182 (D.Ct.S.D.Miss. 1989). The district court in this receivership action ordered the law firm to turn over its records without payment or promise of payment, notwithstanding a valid retaining lien. The case dealt with the liquidation of a financial institution under federal regulations, not the Bankruptcy Code. The court held, however, that the Bankruptcy Code provided the best guidance as to how to deal with a retaining lien. The receiver had determined that under *Banks and Banking,* 12 C.F.R. § 611.1174, the institution's assets would be exhausted in payments on claims "which are secured by specific assets of the bank" and other claims having priority over the claims of general creditors. The district court ruled that papers in the law firm's possession were not the sort of property which constituted "specific assets" of the bank. It held that the law firm would receive no payment on its unsecured claim and, therefore, that its retaining lien afforded it no practical leverage; it ordered turnover to the receiver without payment. This rationale, if followed, would generally invalidate retaining liens since papers retained by a professional seldom have any intrinsic value.

In *In re Louis C. Bowers & Sons, Inc.,* 1990 WL 52415, 1990 U.S.Dist. LEXIS 4808 (D.N.J.1990) the New Jersey district court accorded the retaining lien more sympathetic treatment. That court ruled that the law firm was entitled to a replacement lien not contingent on the proceeds of the litigation to which the turnover related and remanded the case to the bankruptcy court to provide such a lien. The bankruptcy court's turnover order had purported to provide adequate protection by granting the law firm a contingent interest in the award, if any, realized from the lawsuit to which the papers related.

In a Bankruptcy Act case the Seventh Circuit in *Brannon v. Gay (In re Browy),* 527 F.2d 799 (7th Cir.1976) concluded that the debtor could be afforded access to the attorney's papers without depriving the attorney of the benefit of the retaining lien. The court apparently ducked the valuation question by suggesting that the attorney would be allowed full payment on a priority basis to the extent that the estate had sufficient assets. The court said "[i]f there is any money in the estate, Gay will have a superior claim to the funds; if there is no money, he would not be paid in any event." 527 F.2d at 802. Subsequent courts have had some difficulty with this solution since under section 361 of the Code adequate protection may not be provided by way of an administrative claim. But even if this constraint is ignored, there is no obvious justification under the Bankruptcy Code for allowing DGB an administrative claim of over $22,000, especially in view of the Debtor's very limited resources. The problem is that except for section 542 the Bankruptcy Code provides no mechanism for valuing or dealing with the retaining lien.

■ The liens and interests provided for in the Code are rights in property of the debtor which, at least in principle, are capable of sale. Although the methods of valuation may differ widely—liquidation, going concern, replacement—all refer ultimately to market concepts for their meaning and validation. The value of the retaining lien, on the other hand, bears no relationship to any sort of market concept. The value is solely a function of the client's need. The closest analogy is ransom not sale.

■ The retaining lien is a coercive device to enforce payment. The interest in the papers retained is secondary and merely a means for perfecting the coercion. Therefore, those sections of the Code which deal with property interests in the ordinary sense such as section 506, dealing generally with valuation, and sections 361 and 362, dealing with adequate protection, simply don't fit the retaining lien. As DGB argues, the retaining lien cannot really be valued separately from its coercive compo-

nent. But the alternative is not to ignore section 542 and require payment of the lien as if no bankruptcy case existed or to accord the lien no value at all.

 Like most other courts which have wrestled with the retaining lien, this Court interprets the general intent of the Bankruptcy Code to preserve a valid state created right or interest to the extent consistent with the Code. The Court understands that mandate in this case to be that the exigencies of the bankruptcy process take priority over the lien; that the lien will be given effect only to the extent that it does not frustrate administration of the case. As a practical matter, this can be accomplished in this case only by according the lien something akin to administrative status based on the extent of the contribution, if any, which access to the papers in the Anderson Case made to the Debtor's estate. Since this case does not involve adequate protection, the Court is not forced to reconcile this approach with section 361 of the Bankruptcy Code.

 In circumstances where the lawsuit to which the retaining lien relates will result in an award to the estate, it appears appropriate to permit the professional to share in the reward. Without release of the papers retained, the award might not have been received or at least the cost of obtaining it substantially increased. Even if there is no award, the section 542 turnover may have saved the estate fees or other expenses and, to that extent, benefited the estate. It can be argued plausibly, therefore, that unless the professional receives some share of the benefit, creditors of the estate will have been unjustly enriched at the professional's expense.

 But where the papers turned over neither add to the estate nor help preserve it, there appears to be no basis on which to compensate the lien holder. In that circumstance, to accord the lien holder priority in distribution of the Debtor's assets would in effect be to penalize the Debtor for invoking section 542(e) and to award to the lien holder a payment justified neither by the inherent value of any property right of which it was deprived or any benefit

conferred upon the estate. This conclusion is consistent with the reasoning and results in *Jarax, Browy, Federal Land Bank, supra,* and with the district court's analysis in *Superintendent of Insurance of the State of New York v. Baker & Hostetler,* 668 F.Supp. 1054 (N.D.Ohio 1987), *aff'd,* 826 F.2d 1065 (6th Cir.1987) (without opinion).

This approach might result in no payment being made on a valid state retaining lien. In other circumstances as well the courts have recognized that the professional may have to relinquish a retaining lien without payment. It was noted in *Federal Land Bank, supra,* that "a lawyer should forego his right to enforce a retaining lien when a former client lacks the means to pay the lawyer's fee and has an urgent need for the papers to defend a criminal prosecution or to assert or defend a similarly important liberty." 128 F.R.D. at 184, citing *Pomerantz v. Schandler,* 704 F.2d 681 (2nd Cir.1983) and *Lucky–Goldstar International v. International Mfg. Sales Co.,* 636 F.Supp. 1059, (N.D.Ill.1986). *See also* Johnson, *Solicitations of Law Firm Clients By Departing Partners and Associates; Tort Fiduciary and Disciplinary Liability,* 50 U.Pitt.L.Rev. 1 (1988) footnote 165 and cases cited therein. Section 542(e) of the Bankruptcy Code is simply another circumstance in which the power of coercion granted professionals through the retaining lien must give way to competing concerns and interests.

It is unclear to the Court at this point whether the litigation in the Anderson Case has or will result in any benefit to the Debtor or its estate. If it does, it will then be appropriate to examine DGB's contribution to achieving that benefit. Debtor claims that this benefit was minimal because the same documents were available by public record and the turnover was no more than a convenience. But the Debtor will have a heavy burden to prove it really didn't need access to the papers in the Anderson Case despite the time constraints and other pressures it alleged to force turnover. Moreover, it appears under Ohio law that the award is not to be measured only

by the papers copied but, more importantly perhaps, by the Debtor's access to the papers in the Anderson Case at the time and under the circumstances in which such access was ordered.

In summary, the Court will adjourn the evaluation of the DGB lien to such time as the result of the lawsuit can be perceived with greater clarity.